STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-59


SOUTHPARK COMMUNITY HOSPITAL, LLC

VERSUS

SOUTHPARK ACQUISITION COMPANY, LLC, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20093386
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of John D. Saunders, Jimmie C. Peters, and John E. Conery, Judges.

Peters, J., concurs in part, dissents in part, and assigns written reasons.


**AFFIRMED.**

**Ted W. Hoyt**
**D. Reardon Stanford**
**Russell B. Kahn**
**Hoyt & Stanford, LLC**
**315 South College Road, Suite 165**
**Lafayette, Louisiana 70503**
**(337) 234-1012**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Broussard Hospital Holdings L.L.C.**

**Kyle M. Keegan**
**Dustin R. Bagwell**
**Keegan, DeNicola, Kiesel, Juban & Lowe, LLC**
**5555 Hilton Avenue, Suite 205**
**Baton Rouge, Louisiana 70508**
**(225) 364-3600**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Southpark Acquisition Company, LLC**
    **Irvin T. Gregory**
    **J. Michael Mullins**
    **James Ramirez**

**Andrew H. Meyers**
**Timothy W. Basden**
**Beaud & Meyers**
**Post Office Box 3448**
**Lafayette, Louisiana  70502**
**(337) 266-2200**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Tynes Mixon, M.D.**
    **Andrew Hargroder, M.D.**
    **Doreen Abadco, M.D.**

**Morris M. Haik, Jr.**
**209 French Street**
**New Iberia, Louisiana  70560**
**(337) 560-4357**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Tynes Mixon, M.D.**
    **Andrew Hargroder, M.D.**
    **Doreen Abadco, M.D.**

**CONERY, J.**

The plaintiff, Broussard Hospital Holdings, L.L.C., appeals the trial court's partial summary judgment denying its right to future rent relating to its lease of a hospital facility, and judgment on the merits dismissing its claims for past-due rent against certain defendants in this litigation. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This litigation arises from a dispute over a September 20, 2007 contract of lease entered into between two Louisiana limited liability companies: Reorganized Southpark Community Hospital L.L.C. (later to become Broussard Hospital Holdings, L.L.C., and referred to hereafter as "Broussard"),[1] as Landlord or Lessor, and Southpark Acquisition Company, L.L.C. ("Southpark Acquisition"), as Tenant or Lessee. In the agreement, Broussard leased the Southpark Community Hospital ("the hospital"),[2] a twenty-bed facility located at 314 Youngsville Highway, Lafayette, Louisiana, to Southpark Acquisition for a term of 240 months beginning September 20, 2007. The lease agreement further provided that "[t]he Premises shall be used by the Tenant for the operation of a hospital, as allowed by the City of Lafayette, the United States Government and licenses by the State of

---

[1] The June 4, 2009 suit arising from the dispute over this lease was initiated by Southpark Community Hospital, L.L.C. without reference to the "Reorganized" portion of the title on the lease. On April 12, 2010, the trial court granted Southpark Community Hospital, L.L.C. leave of court to substitute Broussard Hospital Holding, L.L.C. as the proper-party plaintiff based on a July 22, 2009 quitclaim and assignment and assumption of rights. Unless specific identification is required, and to avoid confusion based on the similarities of the parties' names, we will identify the plaintiff as Broussard throughout the opinion, even in matters occurring prior to the substitution.

[2] The property description attached as an exhibit to the lease agreement included the 3.81 acres where the hospital facility is located as well as all "buildings, structures, improvements, fixtures, appurtenances, rights, ways, privileges, belonging or appertaining to the Property[.]"

Louisiana." The original base rental was $102,000.00 per month, due each month in advance.[3]

Southpark Acquisition is owned by fifteen physicians and Southpark Investment Group, L.L.C. ("Southpark Investment"). As an additional inducement for the Lessor to execute the lease, the fifteen physicians and Southpark Investment signed guaranties in the Lessor's favor, wherein they each guaranteed payment of Southpark Acquisition's lease obligation based on their ownership percentage in Southpark Acquisition. The sixteen guarantors and their ownership interests are listed as follows:

| Contributor | Ownership Interest |
|---|---|
| George Williams, M.D. | 5% |
| Tynes Mixon, M.D. | 5% |
| Andrew Hargroder, M.D. | 5% |
| Jibran Atwi, M.D. | 2% |
| Mark McDonnell, M.D. | 5% |
| Robin Ardoin, M.D. | 1% |
| Doreen Abadco, M.D. | 5% |
| Juan Paredes, M.D. | 3% |
| Juan Zeik, M.D. | 1% |
| Roderick Clark, M.D. | 2% |
| Maximo Lamarche, M.D. | 2% |
| Akshey Gupta, M.D. | 1% |
| Curtis Beauregard, M.D. | 5% |
| Martha Coppage, M.D. | 2% |
| Federico Del Toro, M.D. | 1% |
| Southpark Investment Group, L.L.C. | 55% |

Although formed as a Louisiana limited liability company, Southpark Acquisition's business office was physically located in Houston, Texas, where its Chief Executive Officer, Irvin Gregory, and its Chief Financial Officer, Michael

---

[3] Section 4(a) of the lease provided that the actual monthly payment would increase by one and one-half percent per year for the first fifteen years of the lease.

Mullin, resided and maintained offices. Both men also owned an interest in Southpark Investment. Although James Ramirez functioned as the administrator of the hospital and served as Southpark Acquisition's on-site representative in Lafayette, Louisiana, all operational and financial decisions concerning the hospital were made in Houston, Texas, with Mr. Gregory having the final decision-making authority.

Mr. Gregory and Mr. Mullin also jointly owned Hospital Investment Group ("HIG"), a legal entity which loaned Southpark Acquisition and/or the hospital approximately $1,400,000.00 for operational expenses between September of 2007 and May of 2009. HIG secured its loans by a lien against all otherwise unencumbered assets of the hospital and/or Southpark Acquisition including, but not limited to, the equipment and accounts receivable. The existence of the loans and lien was divulged to Broussard only after this litigation began.

The hospital appears to have suffered financial difficulties from the start and by early 2009, was struggling to stay afloat. In fact, the situation was so dire vendors were refusing to provide supplies to the hospital unless they were paid in advance. Given the situation, Southpark Acquisition fell behind on its financial obligations under the lease as well.

By a letter dated March 26, 2009, Broussard notified Southpark Acquisition that it had failed to pay the March 20, 2009 rental payment and that if the amount was not paid within ten days of the receipt of the notice, the failure to pay would constitute an act of default pursuant to Section 17 of the lease, and that Broussard would pursue any remedies available to it pursuant to Section 18 of the lease.[4] In

---

[4] Section 17 sets forth the acts or omissions which would constitute an act of default under the lease, while Section 18 sets forth the remedies available to the non-defaulting party.

the letter, Broussard also notified Southpark Acquisition that it was two months in arrears on the payments due under a September 15, 2008 promissory note it had executed in favor of Broussard in the original amount of $361,000.00, and Broussard was declaring the entire note immediately due and payable pursuant to its terms.

Mr. Gregory received this default notice and demand letter, but did not respond because Southpark Acquisition did not have the money to satisfy either demand. Instead, Southpark Acquisition ignored the problem until May 15, 2009, when it sent cash-call letters to each of the sixteen guarantors hoping to raise a total of $700,000.00 to address the lease deficiency only.[5] Based on the percentage of ownership, the physician guarantors were called upon to produce a total of $315,000.00, with the remainder of the $385,000.00 to come from Southpark Investment.

In response to this cash-call request, seven of the physician guarantors[6] caused a letter to be prepared and mailed to the other physician guarantors by their legal counsel on May 20, 2009. In that letter, the remaining guarantors were informed that the seven had agreed to contribute their pro rata share of the cash-call ($98,000.00), and were "strongly encouraged" to do the same. However, the letter also informed the other guarantors that the seven had agreed to place their share in an escrow account with their attorney's firm, and they suggested that the remaining guarantors make their contribution to that account and not to Southpark Acquisition. The attorney writing the letter further notified the remaining

---

[5] The sixteen guarantors had not committed to guarantee the promissory note.

[6] The seven guarantors were Dr. Jiban Atwi, Dr. Mark McDonnell, Dr. Robin Ardoin, Dr. Juan Zeik, Dr. Roderick Clark, Dr. Maximo Lamarche, and Dr. Akshey Gupta. These seven doctors also owned interest in Broussard.

guarantors that should they fail to answer the request, they each would receive "formal demand for the full amount [they] owe under [their] guaranty of lease."

The ultimate result of the cash-call effort was that Southpark Acquisition did not raise the revenue necessary to meet its financial obligations to Broussard. Finding no solution in sight, toward the end of May 2009, both Southpark Acquisition and HIG made business decisions to cut their losses associated with the hospital. However, before Southpark Acquisition took any steps in that direction, Mr. Gregory and Mr. Mullin, through HIG and without notice to Broussard, removed equipment from the hospital that had served as security for the loans it had made to the hospital.[7]

After HIG protected its security interest, Mr. Gregory instructed Mr. Ramirez to take the steps necessary to begin closure of the hospital. The hospital discharged its last patient on May 29, 2009, and, on the morning of June 3, 2009, Mr. Ramirez called an unscheduled staff meeting and circulated a memorandum to all employees. The first sentence of the memorandum to the employees stated: "It is with great regret that I must tell you that Southpark Hospital is closing today." At the staff meeting and through the memorandum, Mr. Ramirez informed all of the hospital employees that the hospital was being closed effective that date. In coordination with this activity, a sign was posted on the hospital's door stating, "Southpark Hospital Closed Effective June 3, 2009[.] Any inquiries can be made to 832-717-3444." Additionally, a press release was placed on the hospital's door, which read:

> This press release serves as official notice that Southpark Hospital
> will close as of 9 a.m. today, June 3, 2009. No services will be

---

[7] Mr. Gregory testified that this removal action occurred in late May or early June of 2009.

rendered after 9 a.m. today. This includes all departments. *An orderly process of closure is proceeding as the hospital is transitioned and closed.* This includes access to patient's [sic] records and to preserve patient confidentiality.
Any inquiries can be made to 337-769-4080 or 833-717-3444.
(Emphasis added).

Although Southpark Acquisition gave no advance notice to Broussard of its decision, at some point during these closure events, Dr. Kenneth Spiller, a principal in Broussard and its managing member, became aware of rumors regarding the closure of the hospital. On June 3, 2009, after being told of the postings on the hospital door, he emailed Mr. Mullen concerning the status of the hospital. When he heard that same day that equipment had been removed from the hospital, he instructed Broussard's attorney to proceed with litigation against Southpark Acquisition to protect Broussard's interests.

Broussard's attorney followed Dr. Spiller's instructions and, on the next day, filed the suit now before us. Broussard titled the pleading as a "**PETITION FOR DECLARATORY JUDGMENT, FOR DAMAGES, FOR AMOUNTS DUE UNDER LEASE AND PROMISSORY NOTES, AND FOR A WRIT OF SEQUESTRATION**." Initially, Broussard named Southpark Acquisition as the sole defendant.

With regard to the lease, Broussard asserted that Southpark Acquisition had ceased to do business on June 3, 2009; *had abandoned, or was in the process of abandoning, the facility*; and was $517,650.00 in arrears on the lease, having failed to make payments since December of 2008.[8] Broussard further asserted that it had given Southpark Acquisition written notice of its default under the lease and that "[t]he entirety of the amounts due under the terms of the Lease are now accelerated

---

[8] The petition asserted that the monthly payment was now $103,530.00 based on the annual increase in the base payment pursuant to the terms of the lease.

6

and fully due and owing," and that the total amount due Broussard was no less than $6,120,513.00, as calculated under Section 18 of the lease.

Broussard did not seek cancellation of the lease. Instead, it sought a declaratory judgment recognizing that Southpark Acquisition was in default under the lease and sought a seizure of the property subject to the lease through the issuance of a writ of sequestration.

With regard to the September 15, 2008 promissory note, Broussard asserted that Southpark Acquisition was $72,000.00 in arrears under that obligation and that Broussard was entitled to the entire balance on the note together with interest and attorney fees.

The trial court granted the request for the writ of sequestration, and, on June 5, 2009, the Lafayette Parish Clerk of Court transmitted the writ to the Lafayette Parish Sheriff's Office for proper service. On that same day, the trial court issued an order appointing a substitute custodian and receiver of the property seized under the writ. The Lafayette Parish Sheriff's Office placed notice of the issuance of the writ on the hospital door on June 5, 2009,[9] and served Southpark Acquisition with notice of the writ on June 10, 2009, at 10:30 a.m. Southpark Acquisition joined issue in the litigation by filing an answer to the petition on July 2, 2009.[10]

On October 2, 2009, Broussard amended its petition to add four of the physician guarantors, who had not responded to the cash-call, as defendants. Three remain as defendants to this litigation: Dr. Tynes Mixon; Dr. Andrew Hargroder;

[9] The record does not contain the Sheriff's return for this action, but Mr. Ramirez testified that he was present at the hospital when the notice was posted to the door.

[10] Despite the fact that this answer appears of record, Broussard sought and obtained from the trial court a preliminary default against Southpark Acquisition on June 4, 2010.

7

and Dr. Doreen Abadco (hereinafter referred to as the "guarantor defendants").[11] These guarantor defendants responded to the claims against them by filing an answer on January 19, 2010.

Broussard filed a motion for summary judgment against all the defendants on June 29, 2010, and this motion gave rise to the first judgment that is the subject of this appeal. The motion sought a judgment against all of the defendants on all elements of damages asserted with regard to the lease, which included both past-due and future rents.

Southpark never responded to the motion for summary judgment.[12] The guarantor defendants responded on August 20, 2010, by filing their own motion for summary judgment. In that motion, they sought a judgment to the effect that their guarantees would not apply to a claim for future rents, because Broussard had forfeited the right to collect such amounts by disturbing Southpark Acquisition's peaceful possession of the leased property. With regard to the claim for past-due rent, the guarantor defendants claimed that those amounts had been satisfied by the other physician guarantors.

The cross-motions for summary judgment initially came before the trial court on September 7, 2010. At the hearing, the minutes reflect that the following evidence was introduced, 1) "BROUSARD-1 GLOBO - MOTION FOR SUMMARY JUDGMENT, BY BROUSSARD HOSPITAL HOLDINGS WITH ALL ATTACHMENTS; BROUSSARD'S OPPOSITION MEMO EXCLUDING

---

[11] Federico del Toro, M.D. was named as the fourth defendant in the October 2, 2009 amending petition. However, he never formally responded to the pleadings and Broussard dismissed its claims against him on October 22, 2010.

[12] In fact, the last pleading addressed to the issues raised in this litigation filed by Southpark Acquisition was its January 21, 2010 answer to the original petition. Since that time, Southpark Acquisition has allowed the guarantor defendants to carry the primary defense burden through trial and did not even appear at trial.

8

ATTACHMENTS 2) MIXON -1 GLOBO CROSS MOTION FOR SUMMARY JUDGMENT, FILED BY TYNES MIXON ET AL WITH ALL ATTACHMENTS." After oral argument, the trial court denied Broussard's motion for summary judgment in its entirety against both the guarantor defendants and Southpark Acquisition. The trial court then heard oral argument on the guarantor defendants' cross-motion for summary judgment. It denied the cross-motion as it pertained to future rent, but continued the portion of the cross-motion pertaining to "past-due rent" and allowed the parties to file additional evidence in support of their positions.

On November 19, 2010, Broussard filed a supplemental memorandum in opposition to defendants' cross-motion for summary judgment with three attachments. The matter was ultimately continued to November 29, 2010, and at the conclusion of that hearing, the trial court reversed its position concerning future rent and granted in part the guarantor defendants' cross-motion for summary judgment. The trial court found that the landlord, Broussard, had disturbed the peaceful possession of Southpark Acquisition on June 5, 2010 and thus, had forfeited its claim for future rent. However, the trial court denied both Broussard's motion and the guarantor defendants' cross-motion for summary judgment on the issue of past-due rent. The trial court executed a written judgment on December 10, 2010, but declined to designate the summary judgment ruling on the issue of future rent as a final, appealable judgment.

On December 30, 2010, Broussard filed a motion for new trial which the trial court denied after hearing on January 24, 2011.[13] Prior to the denial by the trial

---

[13] The record does not contain a transcript of the oral reasons for ruling or a written judgment of this denial.

court of its motion for new trial, on January 5, 2011, Broussard filed notice of its intent to apply to this court for supervisory writs. A panel of this court denied Broussard's application for supervisory writs on June 23, 2011, finding that Broussard would have adequate relief through an appeal once a final judgment was rendered in this matter. *Southpark Cmty. Hosp., L.L.C. v. Southpark Acquisition Co., L.L.C.*, 11-114 (La.App. 3 Cir. 6/3/11) (unpublished writ).

On February 22, 2012, Broussard moved for reconsideration and/or revision of the December 10, 2010 partial summary judgment on the issue of future rent. The motion and memorandum in support were accompanied by numerous attachments not previously placed into evidence as exhibits at the three prior hearings on this issue of future rent.

On May 14, 2012, a fourth hearing was held on Broussard's motion for reconsideration and/or revision of the December 10, 2010 partial summary judgment on the future rent issue. The record does not reflect that any additional evidence was submitted at that hearing. The trial court issued oral reasons from the bench denying Broussard's motion for reconsideration and also denied Broussard's request to certify the ruling as a final judgment.[14] Judgment was rendered on June 11, 2012, again denying Broussard's motion for reconsideration.

With the preliminary matters basically resolved, the remaining issue of past-due rent owed by Southpark Acquisition and the guarantor defendants proceeded to a trial on the merits on September 17, 2012.[15] At trial on the merits, the parties

---

[14] The record does not contain a transcript of the oral reasons for ruling.

[15] The record is silent concerning the disposition of the promissory note issue.

submitted several stipulations into the record, the last of which concerned Broussard's continued attempt to re-litigate the issue of its right to future rent.

In addition to the stipulation, Broussard also offered by way of proffer, the documentation previously attached to its last motion, the May 14, 2012 motion, for reconsideration of the December 10, 2010 judgment of the trial court. Counsel for Broussard explained to the trial court that the proffer was for the convenience of this court on appeal. The stipulation stated:

> 5. It is further stipulated that in light of the Court's prior rulings on cross-motions for summary judgment and subsequent motion(s) to reconsider and/or revise same, the court having dismissed the claims for "future rent", but same having not been made a final judgment, the parties agree that in lieu of BHH calling witnesses and/or presenting evidence on this issue at the trial of this matter, BHH may submit the attached written proffer of evidence. Defendants, Hargroder, Mixon and Abadco waive their objections as to authenticity of documents, but otherwise reserve their objections as to any such evidence. Each party otherwise reserves its rights with regard to said evidence and the issues raised therein, for appeal.

The guarantor defendants filed in conjunction with the stipulation on the issue of future rent, a pleading entitled "OBJECTION TO EVIDENCE REGARDING THE ISSUE OF 'FUTURE RENT' AND PLAINTIFF'S PROFFER." ("Objection") The Objection contained both general and specific objections to both witnesses and exhibits not presented to the trial court at any of the three previous hearings. The guarantor defendants objected to Plaintiff's proffer and urged:

> [A]ny evidence filed as a part of the Proffer which was not filed in opposition to the Motion for Summary Judgment cannot be considered on the issue of whether the Motion for Summary Judgment was properly granted. The Proffer contains documents and other matters which was [sic] not filed in opposition to the Motion for Summary Judgment but which was [sic] otherwise available and could have been filed. Broussard Hospital Holdings cannot assert that the Summary Judgment was improperly granted by proffering evidence which it did not file in opposition to the Motion.

11

Upon completion of the evidence phase of the trial, the trial court took the issue of past-due rent under advisement. The judge made no further comment on the future rent issue and did not indicate whether the objection to the proffer was sustained or overruled. On October 15, 2012, the trial court issued written reasons for judgment rejecting Broussard's claims for past-due rent by finding that any past-due amounts owed were satisfied by payments made to Broussard by eight of the other physician guarantors. On October 24, 2012, the trial court signed the final judgment, which was filed on October 29, 2012, dismissing all claims by Broussard against both the guarantor defendants and Southpark Acquisition, which included claims for both past-due and future rent. It is from this final judgment on both the issue of past-due and future rent that Broussard appeals.

### *Broussard's Assignments of Error*

Broussard appeals the trial court's judgment, raising eleven assignments of error:

1. The Trial Court committed reversible error in determining that the June 5, 2009 email from Louis Phillips constituted an eviction and/or otherwise disturbed the tenant, Southpark Acquisition Company, L.L.C., [] in its possession of the leased property.

2. The Trial Court committed reversible error in failing to find that [Southpark], in closing the hospital and ultimately leaving the premises[,] abandoned the property.

3. The Trial Court committed reversible error in granting summary judgment in favor of [defendants] denying [Broussard's] claims as to "future rent"[.]

4. The Trial Court committed reversible error in denying [Broussard's] Motion for Summary Judgment[.]

5. The Trial Court committed reversible error in denying [Broussard's] Motion for New Trial[.]

12

6. The Trial Court committed reversible error in denying [Broussard's] Motion to Reconsider And/Or Revise Prior Partial Judgment Pursuant to La.C.C.P. art. 1915[.]

7. The Trial Court committed reversible error in otherwise failing to render judgment in favor of [Broussard] on the issue of "future rent".

8. The Trial Court committed reversible error in finding that the sums paid [by] those members of [Broussard]—and whom were also guarantors on the lease at issue—to purchase their interest in BHH, constituted a payment of the rent owed under the lease.

9. The Trial Court committed reversible error in finding that the past-due rent had been "paid" by the [Broussard] members who purchased their membership in [Broussard] and received a cancellation of their respective lease guranties [sic].

10. The Trial Court committed reversible error in rendering judgment in favor of [defendants], and dismissing [Broussard's] demands with prejudice, at [Broussard's] costs.

11. The Trial Court committed reversible error in rendering judgment denying [Broussard's] claim for costs and attorney fees.

## LAW AND DISCUSSION

### *Appellate Standard of Review - Summary Judgment*

Summary judgments are reviewed de novo, applying the same standard to the matter as that applied by the trial court. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730. Summary judgment is favored by the law and provides a vehicle by which the just, speedy, and inexpensive determination of an action may be achieved. La.Code Civ.P. art. 966(A)(2). At the time of this litigation, La.Code Civ.P. art. 966(B)(2) provided that judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any, show that there is no

13

genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law."[16] (Emphasis added).

A fact is material when its existence or nonexistence may be essential to a plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *Smith,* 639 So.2d at 751 (citations omitted) (alteration in original). In other words, a material fact is one that would matter on the trial on the merits. "Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits." *Id.*

In determining whether a fact is material, we must consider the substantive law governing the litigation. *Davenport v. Albertson's, Inc.,* 00-685 (La.App. 3 Cir. 12/6/00), 774 So.2d 340, *writ denied*, 01-73 (La. 3/23/01), 788 So.2d 427.

A lease is a synallagmatic contract which burdens both the lessor and the lessee with certain obligations. La.Civ.Code art. 2668. The lessor's obligations are three-fold: 1) to deliver that which is the subject of the lease to the lessee; 2) to maintain the object in a suitable condition; and 3) to maintain the lessee in peaceable possession for the duration of the lease. La.Civ.Code art. 2682. The lessee, likewise, is obliged: 1) to pay the rent pursuant to the terms of the lease; 2) to prudently administer the lease according to the lease terms; and 3) to deliver the object to the lessor. La.Civ.Code art. 2683.

In the event that a lessee breaches a lease, the lessor may pursue one of two options:

---

[16] 2012 La. Acts No. 257, § 1 amended La.Code Civ.P. art. 966(B)(2) to delete the words "on file" in this article.

[H]e may sue to *cancel* the lease and to recover accrued rentals due, or he may sue to *enforce* the lease and to recover both accrued rentals and future accelerated rentals (if the lease contains an acceleration clause). These remedies are mutually exclusive. If the lessor elects to *cancel* the lease, the lease is terminated and the lessor is entitled to return into possession, but he forfeits the right to all future rentals. On the other hand, if the lessor elects to *enforce* the lease, he may obtain a money judgment against the lessee based on the terms of the lease agreement, but the lease remains in effect and the lessee retains the right of occupancy for the remainder of the term of the lease.

*Richard v. Broussard*, 495 So.2d 1291, 1293 (La.1986). (Citations omitted) (Emphasis added).

Not only are the remedies set forth in *Richard* mutually exclusive, but any attempt by a lease document "to circumvent established law…is unenforceable." *1001 Harimaw Court E., L.L.C. v. Blo, Inc.*, 10-860, p. 4 (La.App. 5 Cir. 5/24/11), 66 So.3d 1131, 1133.

In accordance with *Richard*, and reiterated by the court in *Entergy Louisiana, Inc. v. Kennedy*, 03-0166 (La.App. 1 Cir. 07/02/03), 859 So.2d 74, a clause in a contract of lease which allows the landlord the right to disturb the possession of a tenant and also assert a claim for payment of future rent is unenforceable. The court stated:

[T]he lessee's right to peaceable possession is a matter of public policy that cannot be waived. Therefore, should the lessor fail to provide the lessee with peaceable possession, the lessee's obligation to pay rent ceases, and no "hell or high water" clause can be relied upon to resurrect that obligation.

*Id*. at 80-81.

If a lessor chooses to cancel the lease and terminate the lessee's right of occupancy, the lessor must follow the statutory eviction procedures set out in La.Code Civ.P. art. 4701 et seq. However, a judicial exception to this requirement exists in instances where the lessee has abandoned the leased premises. *Horacek v. Watson*, 11-1345 (La.App. 3 Cir. 3/7/12), 86 So.3d 766. "In determining whether

abandonment has occurred, there must be a showing that the lessee voluntarily relinquished the premises and intended to terminate without vesting ownership in another." *Bill Kassel Farms, Inc. v. Paul*, 96-462, p. 5 (La.App. 3 Cir. 12/11/96), 690 So.2d 807, 809, *writ denied*, 97-712 (La.4/25/97), 692 So.2d 1095, *citing Preen v. LeRuth,* 430 So.2d 825 (La.App.5 Cir. 1983). "[T]he abandonment of property by a tenant to such an extent as to vest title and control in the landlord involves both an act of abandonment and specific intent to abandon." *Powell v. Cox*, 92 So.2d 739, 742 (La.App. 2 Cir. 1957).

### *Broussard's First Seven Assignments of Error*

Each of these assignments of error stems from Broussard's claim that the trial court erred at the initial hearing on September 7, 2010, in denying Broussard's request for a judgment on its overall damage claim. However, the real crux of Broussard's first seven assignments of error is based on the November 29, 2010 initial denial by the trial court of Broussard's motion for summary judgment on its claim for future rent against Southpark Acquisition. After the hearing, the trial court not only denied Broussard's motion, but granted the guarantor defendants' cross-motion for summary judgment, on the issue of future rent, which is memorialized in the trial court's December 10, 2010 judgment. In its judgment the trial court found that Southpark Acquisition "was evicted or otherwise disturbed in its peaceful possession of the subject property[.]" Thus, Broussard was not entitled to future rent from either Southpark Acquisition or the guarantor defendants.

The trial court, after two subsequent hearings on motions by Broussard seeking a new trial and reconsideration of the December 10, 2010 judgment, never wavered from its original ruling in favor of the guarantor defendants and Southpark Acquisition denying Broussard future rent. Over written objection of

the guarantor defendants, the trial court, via stipulation, allowed Broussard to proffer additional documents in an effort to reverse the December 10, 2010 ruling of the trial court on appeal.

The proffer of Broussard, which is a compilation of the documents, affidavits, and other evidence, which Broussard placed in the record before the trial court in its attempt to change the outcome of the December 10, 2010 judgment, does not create genuine issues of material fact. Despite Broussard's arguments that the lease was abandoned because the lessee ceased operation of the hospital on the leased premises, the central fact remains that this matter involves a dispute between a lessor and a lessee, not a lessor and a hospital. In particular, the determinative facts at issue are whether the lessee's undisputed right to peaceful possession of the leased premises was disturbed by the lessor.

The question of Southpark Acquisition's ability to maintain a hospital on the leased premises still remains unanswered due to the actions taken by Broussard. The undisputed facts determined by the trial court involved Broussard's actions beginning on June 4, 2009, when Broussard filed a writ of sequestration, and, when, on June 5, 2009, Broussard then had the writ served and a custodian appointed to secure the leased premises. Broussard followed up with an email threatening an action for trespass. The question then became whether the lessee had abandoned the leased premises, or was the lessee still in possession of the leased premises and entitled to peaceable possession.

The material facts pertaining to the issue of future rent considered by the trial court on September 7, 2010, and again on November 29, 2010, never changed. The guarantor defendants' position in their cross-motion for summary judgment on the issue of future rent was and remains that the lessor cannot sue to evict, thus

disturbing their peaceful possession, and then sue to collect future rent. The question of the ability of Southpark Acquisition to maintain a hospital on the leased premises and the documentation supporting this assertion by Broussard, does not and did not create a material issue of fact bearing on the initial or subsequent rulings of the trial court on the issue of future rent. The trial court held and we agree that the landlord, under the circumstances of this case, cannot sue for eviction, seize control of the property, appoint a custodian and threaten trespass, and then sue for future rent as well, unless there was an abandonment of the leased property by the tenant.

### *Eviction Versus Abandonment- Broussard's Right To Future Rent*

Broussard argues that Southpark abandoned the hospital and so attested in its "Petition for Declaratory Judgment, for Damages, for Amounts Due Under Lease and Promissory Notes, and for a Writ of Sequestration" ("Petition") filed on June 4, 2009. In the petition Broussard averred, "Upon information and belief, Defendant ceased to do business on the Premises on June 3, 2009 . . . Upon information and belief, Plaintiff states that Defendant has abandoned (*or is in the process of abandoning*) the Premises." (Emphasis added).

On June 5, 2009, the district court granted Broussard's sequestration order, based on the June 4, 2009 petition. The order to the clerk of court required the clerk to:

> forthwith issue a Writ of Sequestration directing the Sheriff to seize, sequester and take possession and control of the movable property owned by defendant, Southpark Acquisition Company, L.L.C. ("Defendant"), or under the control of Defendant located at Southpark Community Hospital, 317 Youngsville Highway, Lafayette, LA 70508, together with any such movable property that Defendant may have removed from said Premises without Plaintiff's consent within the past fifteen (15) days of the issuance of the Writ, pending further Order of the Court.

In addition, on June 5, 2009, Broussard also sought and obtained an order appointing a custodian and receiver to take possession of all of the movables in the hospital and store the movables in the hospital building. Mr. Ramirez, the daytime administrator, was present at the hospital on the morning of June 5, 2009, when a Lafayette Parish Sherriff's Deputy arrived at the Southpark Community Hospital and taped the seizure order to the front door.

Broussard's sequestration order in essence seized every piece of movable property in the hospital. This included the chairs, tables, medical records, medicine, needles, suture thread, medical instruments and devices, beds, computers, paper, pens, and everything else. As stated, Broussard also sought and obtained a court order appointing a custodian and receiver, whose responsibility was to take possession of and store the seized property in the hospital building. Once the seizure order was served, both Mr. Ramirez and Mr. Gregory, whom Mr. Ramirez called and notified of the seizure order, agreed it would be impossible to continue to try and operate the hospital, albeit on the limited basis that existed on June 5, 2009.

The issue of the process of abandonment was addressed by the first circuit in the case of *Mansur v. Cox*, 04-140 (La.App. 1 Cir. 12/30/04), 898 So.2d. 446. In *Mansur*, Ms. Mansur, the lessee, admitted at trial that she was in the process of abandoning her apartment when the lessor, Mr. Cox, arrived. An argument ensued, which resulted in Mr. Cox firing a weapon at the truck Ms. Mansur had borrowed for her move.

At the time of the altercation between Ms. Mansur and Mr. Cox, she was removing the last of her belongings to complete the abandonment of the leased

premises. Based on La.Civ.Code art. 2682,[17] which requires the lessor "[t]o protect the lessee's peaceful possession for the duration of the lease," the panel affirmed the trial court's finding that "the intervening actions of Mr. Cox preceded Ms. Mansur's completion of the act of abandonment." *Mansur*, 898 So.2d at 448-49. Mr. Cox's actions constituted wrongful eviction and/or a disturbance of Ms. Mansur's peaceable possession of the leased premises, and he was thus not entitled to future rent under the terms of the lease.

In the case of *Henry v. Rose Mercantile & Mfg. Co. v. Stearns*, 154 La. 946, 98 So. 429 (1923), the supreme court found that the seizure of movables stored in a warehouse and the storage of the same movables by the landlord in the same warehouse made it impossible for the lessee to carry on his warehouse business at the leased premises and thus constituted an eviction. The landlord forfeited his claim for future rent.

The fact situation in *Maggio v. Price*, 1 So.2d 404 (La.App. 1 Cir. 1941), is similar to the facts before this court. The lessee of a commercial enterprise failed to make his rent payments. The landlord sued to seize the movables to secure the rent payments and at the request of the landlord, the sheriff locked the leased premises to secure the movables. This action prevented the lessee from having free and undisturbed access to the leased premises. The landlord argued that the lessee was closing his business, and thus, his actions should be excused. The court of appeal disagreed and found that the landlord's disturbance of possession required him to forfeit any claim for future rent.

In the instant case, not only did Broussard obtain a sequestration order, seize possession of the leased premises, and have the court appoint a custodian, counsel

_____

[17] Formerly La.Civ.Code art. 2692.

20

for Broussard conveyed by email on June 5, 2009, the following notice to Southpark Acquisition:

> We take the position that Southpark Acquisition (and, of course Southwest Health Group) *has no further authority to be on the premises, and we will take any action the law allows against any person from either of those entities who trespasses upon the property of my client.* (Emphasis added).

This email prompted a response from Southpark Acquisition on June 15, 2009 addressing Southpark Acquisition's attempt to secure the medical records of its prior patients. Southpark Acquisition's request had initially been met with a refusal from Broussard and a warning that any "attempt to access the records would violate the sequestration order." Furthermore, the June 15, 2009 email also addresses the threat of an action for trespass conveyed by Broussard in the June 5, 2009 email and states:

> For the record, in response to my request for access to medical records, you wrote to me that our attempt to access the records would violate the sequestration order. You also wrote that my client has "no further authority to be on the premises" and you would take "any action the law allows against any person" from my client who "trespasses" upon the property. Under any possible interpretation, those words constitute a termination of my client's rights under the lease. You have taken possession of the premises through sequestration, and you have no further right to collect accelerated payments under the lease. That was the option you *didn't* choose when you elected to place the premises under the control of your court-appointed custodian and deny my clients further access to the premises.

The parties were subsequently able to work out an agreement that allowed Southpark Acquisition entrance to the premises strictly for the removal of the patients' medical records and to complete the state required procedures necessary to protect the medical records and privacy of former patients.

Based on the foregoing, we find no issues of material fact remain as to the question of eviction of Southpark Acquisition versus their abandonment of the

leased premises. The process of the closure of a business, any business under the law of lease, is not the same thing as the abandonment of the leased premises. The evidence that Southpark Acquisition had stopped admitting patients to the hospital does not constitute abandonment. Based on the holdings in *Maggio* and *Mansur,* even if Broussard knew the hospital was closing, their actions in issuing a writ of sequestration seizing the movables, appointing a custodian, threatening action under the law for trespass, and keeping Southpark Acquisition from securing the medical records of patients as required by law all constituted eviction. No material facts are in dispute on this issue, and the law is clear that the landlord cannot sue for eviction and for enforcement of the lease for future rent.

Accordingly, the motion for partial summary judgment in favor of the guarantor defendants, dismissing Broussard's claim for future rent, as memorialized in the trial court's December 10, 2010 judgment and finalized in the trial court's October 29, 2012 judgment, dismissing all claims made by Broussard against Southpark Acquisition and the guarantor defendants, is affirmed.

### Broussard's Last Four Assignments of Error

At the trial on the merits, Broussard, the guarantor defendants, and Southpark Acquisition[18] entered into a written stipulation that as of June 5, 2009, the past-due amount owed Broussard by Southpark Acquisition under the lease totaled $686,170.94. This included $519,068.22 in rent and $167,102.72 in taxes and assessments. In its final four assignments of error, Broussard argues that the trial court erred in rendering judgment in favor of the guarantor defendants and Southpark Acquisition, rejecting Broussard's claim for past-due rent in this amount.

---

[18] Although Southpark Acquisition waived its appearance at trial, it signed off on the written stipulation.

In rejecting Broussard's claim on this issue, the trial court found as a matter of fact that payments to Broussard by seven of the other physician guarantors totaling $1,200,000.00 exceeded the amount of past-due rent and, therefore, satisfied the debt in full.

A trial court's findings of fact are reviewed on appeal pursuant to the manifest error-clearly wrong standard of review. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Under this standard, the reviewing court should not disturb the trial court's findings where there is conflicting testimony, even if the reviewing court feels that its own evaluations and inferences are more reasonable. *Id.*; *Stobart v. State through DOTD*, 617 So.2d 880 (La.1993). However, an appeal raising a question of law requires the reviewing court to determine whether the trial court was legally correct in its ruling. *Brooks v. Popeye's, Inc.*, 11-1086 (La.App. 3 Cir. 3/14/12), 101 So.3d 59, *writ denied*, 12-1755 (La. 11/2/12), 99 So.3d 676.

The evidence at trial established without contradiction that eight of the physician guarantors to the lease tendered a total of $1,200,000.00 to Broussard in 2009, and were released from their guarantor obligations under the lease. The amount and date of payment, as well as the date of release, as to six of the eight is as follows:

> Dr. Juan C. Zeik: Paid by $100,000.00 check dated March 6, 2009. Released by written act of release executed August 5, 2009.
>
> Dr. Roderick V. Clark: Paid by $200,000.00 check dated April 2, 2009. Released by written act of release executed July 29, 2009.
>
> Dr. Robin C. Ardoin: Paid by $100,000.00 check dated April 20, 2009. Released by written act of release executed August 5, 2009.
>
> Dr. Jibran Atwi: Paid by $200,000.00 check written on the account of Pediatric Group of Acadiana, LLC and dated April 28, 2009. Released by written act of release executed August 5, 2009.

Dr. Maximo B. Lamarche: Paid by $200,000.00 check dated May 8, 2009. Released by written act of release executed August 5, 2009.

Dr. George Raymond Williams: Paid by $200,000.00 check made payable to Hoyt & Stanford Escrow Account on July 10, 2009. Released by written act of release executed August 5, 2009.

Additionally, the parties stipulated that Dr. Akshey Gupta and Dr. Mark McDonald had each paid $200,000.00 to Broussard and were released from their guarantor obligations under the lease. The record does not contain the day these payments were made or the day of their release.

Drs. Clark, Lamarche, and Zeke all testified at trial to the following: 1) they had an ownership interest in Southpark Acquisition; 2) they were guarantors of the Southpark Acquisition lease; 3) they were guarantors of a Southpark Acquisition loan from Regions Bank; 4) they purchased ownership units in Broussard; 5) they obtained a cancellation of their Southpark Acquisition guarantees following the purchase of their ownership in Broussard; 6) they paid nothing for this cancellation; 7) they have not paid any portion of the rent owed by Southpark Acquisition; and 8) their payments to Broussard were not made to satisfy their Southpark Acquisition guarantees.

Despite their assertions that the amounts in dispute were used to purchase ownership interests in Broussard, and that they paid nothing for their release from their lease-guarantor obligations, the three doctors acknowledged that in response to discovery requests propounded to them at one stage of the proceedings, they each responded that "payment of a sum of money was made which was accepted in satisfaction of the guaranty obligation pursuant to the guaranty agreement[.]" In fact, in further answering the discovery requests, each acknowledged that the

24

amount listed above as being paid to Broussard was the amount paid for release from their guarantor obligations.

The remaining physician guarantors were not called to testify. Instead, Broussard and the guarantor defendants stipulated that the testimony of the remaining witnesses, if called to testify, would be consistent with the testimony of these three witnesses.

Thus, the trial court was faced with conflicting factual scenarios. On the one hand, the doctors' testimonies under oath at trial were to the effect that the payments to Broussard were not connected in any way to their lease guarantees and that they received no consideration for their individual release from those guarantees. On the other hand, the doctors had asserted under oath, in the answers to the interrogatories propounded to them that the very purpose of the payments to Broussard was to obtain a release from their guarantees under the lease.

The doctors' trial presentation is supported to some extent by the fact that one of the payments at issue was made before the March 26, 2009 default letter to Southpark Acquisition and that at least four of the remaining seven payments, and possibly as many as six, were made before Southpark Acquisition's cash-call letter. This would lend credibility to the argument that the payments were for an ownership in Broussard separate and apart from the lease problems.

At the same time, the content of the answers to discovery is also supported by the record, which establishes that the financial situation of the hospital was a factor in the decision to contribute to Broussard in exchange for a release from their lease-guarantee obligations. The May 20, 2009 letter from the seven physicians' counsel contained an attachment which explained in detail that the cash-call at that time was a small obligation in comparison to the physicians'

25

individual liability in the event of a complete default by Southpark Acquisition under the lease.

After taking the matter under advisement, the trial court rendered written reasons:

> The Court concludes that the payments made by the co-sureties were made to extinguish their suretyship obligations to BHH, and to obtain a release from the obligation. This was the position taken by BHH and all of the co-sureties, under oath until shortly before the trial. The Court rejects the notion that the co-sureties were released from this significant obligation while paying nothing to obtain their release.
>
> A payment made by a surety in excess of his virile share reduces the amount of the principal obligation to the full extent of the payment. La.C.C. Arts. 3056-3057; Rubin, *Ruminations on Suretyship*, 57 La. L. Rev. at pp. 587-590. As between the defendant sureties and the principle obligee, BHH, the payments made by the co-sureties have extinguished the obligation.
>
> This Court concludes therefore that the plaintiff has failed to meet its burden of proving that any amount remains due on the obligation of [Southpark Acquisition] to [Broussard]. The extinction of the principal obligation extinguishes the suretyship. La. C.C. art. 3059.

The trial court's finding that the payments by the remaining guarantors were made to Broussard with the intent of extinguishing their obligations pursuant to their lease guarantees for the Southpark Acquisition lease were within the trial court's discretion and will not be disturbed on appeal. Accordingly, we find that Broussard received $1,200,000.00 in payments from Southpark Acquisition's guarantors pursuant to their lease guarantees. Thus, Broussard has already received the $686,170.94 that the parties stipulated was owed in past-due rent and no further sums are due.

## DISPOSITION

For the foregoing reasons, we affirm the trial court's grant of a partial summary judgment in favor of Tynes Mixon, M.D., Andrew Hargroder, M.D., and

Doreen Abadco, M.D., and Southpark Acquisition Company, L.L.C. thereby dismissing the claim of Broussard Hospital Holdings, L.L.C. for future rent. We also affirm the trial court's judgment in favor of Tynes Mixon, M.D., Andrew Hargroder, M.D., Doreen Abadco, M.D., and Southpark Acquisition Company, L.L.C. and against Broussard Hospital Holdings, L.L.C. rejecting the demands of Broussard Hospital Holdings, L.L.C. for past-due rent under the September 20, 2007 lease. We assess the costs of this appeal to Broussard Hospital Holdings, L.L.C.

**AFFIRMED.**

SOUTHPARK COMMUNITY HOSPITAL, LLC

VERSUS

SOUTHPARK ACQUISITION COMPANY, LLC, ET AL.

**PETERS, J. concurring in part and dissenting in part.**

I agree with the majority's affirmation of the trial court's judgment in every respect except its affirmation of the trial court's grant of a partial summary judgment in favor of Tynes Mixon, M.D., Andrew Hargroder, M.D., and Doreen Abadco, M.D., on the issue of future rents. I would reverse that portion of the judgment finding the existence of genuine issues of material fact and would remand the matter to the trial court for further proceedings on that issue.

In order for the trial court to have reached the conclusion that Southpark Acquisition "was evicted or otherwise disturbed in its peaceful possession of the subject property[,]" it had to have considered the merits of the issue before it by making credibility determinations, evaluating testimony, and weighing evidence. The majority recognizes this error when it notes that the trial court's December 10, 2010 judgment contains the language that Southpark Acquisitions "was evicted or otherwise disturbed in its peaceful possession of the subject property[.]"

Additionally, while the majority recognizes that "the determinative facts at issue are whether the lessee's undisputed right to peaceful possession of the leased premises was disturbed by the lessor[,]" it simply accepts the inappropriate factual

determination made by the trial court on this issue.  This is a summary judgment case, and the acceptance of the trial court's factual determination by the majority is clear error.  Additionally, the majority attempts to draw a distinction within the lease itself by suggesting that this "matter involves a dispute between a lessor and a lessee, not a lessor and a hospital."  In attempting to draw this distinction, the majority ignores the clear language of the lease agreement to the effect that "[t]he Premises *shall* be used by the Tenant for the operation of a hospital, as allowed by the City of Lafayette, the United States Government and licenses by the State of Louisiana."  (Emphasis added.)  The purpose of the lease agreement cannot be separated from the physical location and Southpark Acquisition's rights under the lease were wholly contingent upon its continued operation of the Southpark Community Hospital.

Summary judgment is a procedural device employed to avoid a trial on the merits when no genuine issue of material fact exists.  *Duncan v. U.S.A.A. Ins. Co.*, 06-363 (La. 11/29/06), 950 So.2d 544.  While La.Code Civ.P. art. 966(A)(2) provides that summary judgment is "designed to secure the just, speedy, and inexpensive determination of every action" and that the "procedure is favored and shall be construed to accomplish these ends[,]" it is not to be a substitute for a trial on the merits.  At the time of this litigation, La.Code Civ.P. art. 966(B)(2) provided that judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law."[1]

---

[1] 2012 La. Acts No. 257, § 1 and 2013 La. Acts No. 391, § 1 both amended La.Code Civ.P. art. 966 and made significant procedural changes to this section of the article.

A "genuine issue" is a "triable issue." *Toups v. Hawkins*, 518 So.2d 1077, 1079 (La.App. 5th Cir.1987) (citing *Brown [v. B & G Crane Service, Inc.*, 172 So.2d 708, 710 (La.App. 4 Cir. 1965)]). More precisely, "[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes." W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 481 (1983). In determining whether an issue is "genuine," courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. *Simon v. Fasig-Tipton Co. of New York*, 524 So.2d 788, 791 (La.App. 3d Cir.), *writs denied*, 525 So.2d 1048, 1049 (La.1988); *Pace v. Zilka*, 484 So.2d 771 (La.App. 1st Cir.), *writ denied*, 488 So.2d 691 (La.1986); *Mecom v. Mobil Oil Corp.*, 299 So.2d 380, 386 (La.App. 3d Cir.), *writ denied*, 302 So.2d 308 (La.1974). "Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact." *Brown*, 172 So.2d at 710; *Sally Beauty Co. v. Barney*, 442 So.2d 820, 822 (La.App. 4th Cir.1983).

A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. *Penalber v. Blount*, 550 So.2d 577, 583 (La.1989). "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *South Louisiana Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3d Cir.1991), *writs denied*, 596 So.2d 211 (La.1992). Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. *Sassone v. Elder*, 626 So.2d 345, 352 (La.1993); *Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co.*, 427 So.2d 1152, 1153-54 (La.1983) (collecting cases); *McCoy v. Physicians & Surgeons Hospital, Inc.*, 452 So.2d 308, 310 (La.App. 2d Cir.), *writ denied*, 457 So.2d 1194 (La.1984) (noting that "[s]ummary judgment may not be used as a substitute for trial").

*Smith v. Our Lady of the lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730, 751 (alteration in original).

The hearings associated with the original motions for summary judgment, the motion for new trial, and the motion to reconsider the ruling on the original motions produced volumes of evidentiary exhibits to be considered by the trial court, and all will not be reproduced in this dissent. However, my review of the

record causes me to reach the conclusion that the trial court erred in granting the guarantor defendants' motion for summary judgment on the issue of future rents.

The primary evidence in support of the guarantor defendants' position that Southpark Acquisition never intended to abandon the hospital and that Broussard's actions basically evicted it comes from the deposition testimony of Mr. Ramirez, Mr. Gregory and Mr. Mullin. All three men testified that they never intended to close the hospital and that they intended to maintain a skeleton-crew presence beginning June 3, 2009, for the purpose of protecting the hospital license. Mr. Ramirez described this effort as three-person crews consisting of a nurse-supervisor, a plant-operations manager, and a medical-records director who would keep the hospital open on a twenty-four-hour basis for the limited purpose of evaluating, stabilizing, and transferring to other facilities any patients who might find their way to the hospital for medical care. According to Mr. Ramirez, if the hospital license was revoked, it would take six to eight months to recover it, and Mr. Gregory pointed out that without a license, a hospital is just a "piece of real estate."

In explaining away the very precise language of the June 3, 2009 memorandum to the employees, as well as the two notices placed on the hospital door, Mr. Ramirez testified that that information was for the hospital staff's benefit only and, that when he discovered the notices had been placed on the hospital door, he immediately removed them. Mr. Gregory suggested that the statement really meant that the hospital was closing as a full-service, fully-staffed hospital.

According to Mr. Ramirez, the skeleton crew was present and the hospital was open for business on the morning of June 4, 2009, but that only one door of the facility remained unlocked. However, when the writ of sequestration was

posted to the hospital door on June 5, 2009, and when its counsel received an email that same afternoon from Broussard's counsel which stated that Broussard took "the position that Southpark Acquisition (and, of course Southwest Health Group) has no further authority to be on the premises, and we will take any action the law allows against any person from either of those entities who trespasses upon the property of my client[,]" Southpark Acquisition took the position that it could no longer occupy the premises.

The evidence in opposition to this position raises numerous genuine issues of material fact. The hospital discharged its last patient on May 29, 2009, and remained vacant from that point forward. HIG began removing equipment subject to its lien sometime in late May,[2] and the language used in the three documents prepared for distribution on June 3, 2009, is very clear in its assertion that the hospital was closed effective that date. Additionally, no one with the hospital or Southpark Acquisition communicated to Broussard the activities in late May and early June. Furthermore, despite Mr. Ramirez's statement that the notices were not to be posted on the hospital door and that he took them down immediately, the October 14, 2010 affidavit of Ronnie Boone, a caretaker of the hospital, asserted that the notices were still on the door the day he signed his affidavit.

Other evidence tending to discredit the assertion that the hospital was to remain open included the emails and documentation provided DHH concerning the status of the hospital. DHH's records contain an email stating that it sent an on-site survey team to the hospital on June 8, 2009, which found the hospital closed; a

_____

[2] In their deposition testimony, Mr. Ramirez, Mr. Gregory, and Mr. Mullin, when asked about the removal of property from the hospital were very careful to state that Southpark Acquisition had not removed any property. It was only when questioned directly that Mr. Gregory and Mr. Mullin acknowledged that HIG had removed property before suit was filed.

5

letter from Mr. Gregory faxed to DHH on June 8, 2009, stating that "[e]ffective June 4, 2009, Southpark shall cease operations and terminate its hospital license and Medicare provider agreement[;]" and a June 8, 2009 report from a DHH nurse to the effect that the June 3, 2009 notices were still on the hospital door on that day and that Mr. Ramirez had informed him that only one nurse remained on duty after June 3, 2009, and that he/she remained on duty only until 3:00 p.m. on June 4, 2009.

An affidavit from Dr. Spiller asserted that he spoke to Mr. Ramirez, who told him that his communication with DHH had not gone well and that the hospital would have to be shut down completely because it did not have adequate staff to accept patients. According to Dr. Spiller, Mr. Ramirez told him on June 5, 2009, that Southpark Acquisition would be turning over the keys to Broussard's custodian on the following Monday, June 9, 2009.

Finally, Broussard introduced the affidavit of Nicholas Gachassin, III, a Lafayette, Louisiana attorney specializing in hospital regulatory matters. After reviewing Southpark Acquisition's June 3, 2009 closure notice and press release and Mr. Ramirez's June 3, 2009 memo, he opined that under DHH's Hospital Licensing Standards, Southpark Acquisition ceased operating on June 3, 2009, and that Southpark Acquisition's license was immediately void as of June 3, 2009. Moreover, Mr. Gachassin opined that maintaining a nurse on site would not protect Southpark Acquisition's license because its license was "wholly dependent on being open for business to serve the community and having the ability to take care of patients who require admission. Keeping a nurse on-site, in my opinion, is not sufficient to maintain a Hospital's license. And, there is no legal or regulatory basis to 'preserve a hospital license' once you cease operating."

In finding that genuine issues of material fact exist as to whether Broussard evicted Southpark Acquisition from the premises or whether Southpark Acquisition abandoned the premises, we also note that pursuant to DHH's regulations, Southpark Acquisition's operating license was immediately voided on June 3, 2009, after all of the hospital's employees were laid off. Louisiana Administrative Code 48:I, § 9307 specifically states that "[a] cessation of business is deemed to be effective with the date on which the hospital stopped providing services to the community." Furthermore, LAC 48:I, § 9303 defines a "hospital" as:

> [A]ny institution, place, building, or agency, public or private, whether for profit or not, maintaining and operating facilities, 24 hours a day, seven days a week, having 10 licensed beds or more, properly staffed and equipped for diagnoses, treatment and care of persons admitted for overnight stay or longer who are suffering from illness, injury, infirmity or deformity or other physical or mental condition for which medical, surgical and/or obstetrical services would be available and appropriate.

In the matter before us, Southpark Acquisition ceased to operate as a hospital on June 3, 2009. While the facility had more than ten licensed beds, it was no longer "properly staffed and equipped" to perform its functions as a hospital. That is to say, it ceased providing hospital services to the community on that day. While Southpark Acquisition's argument is that this action was temporary, there are numerous contested facts that suggest otherwise. By its actions, the hospital ceased being just that, a hospital, without any action required on the part of Southpark Acquisition to surrender its operating license.

Furthermore, despite the officer's well-rehearsed and often-stated mantra that Southpark Acquisition was protecting the hospital's license by maintaining a skeleton crew, they knew that the hospital's operating license was no longer valid

as of June 3, 2009. In a June 4, 2009 email, sent at 4:24 p.m. from Mr. Mullin to Southpark Acquisition's counsel, he admits that DHH informed Southpark Acquisition that it could not continue operating unless it maintained a full staff.

Southpark Acquisition's assertion that it was attempting to preserve the license for its possible replacement is also not persuasive because the license would still have been void in the event Southpark Acquisition was successful in finding another entity to take over the hospital. Pursuant to LAC 48:I, § 9305, the operating license is not assignable or transferrable and becomes immediately voided upon a change of ownership.

Based on the foregoing summary, I find that the evidence presented establishes that genuine issues of material fact remain on the issue of future-rent recovery which require a merits trial to resolve. Having made that finding, I would reverse the trial court's grant of summary judgment in favor of the defendants dismissing Broussard's claims for future-rent payments. At trial, Broussard attempted to proffer the evidence submitted in support of, and in opposition to, the conflicting motions for summary judgment. However, the guarantor defendants objected to evidence submitted in the proffer on various grounds, and the trial court sustained the objection. That being the case, the record before us on the summary judgment issues is not complete, and I would remand the matter to the trial court for a new trial on these issues. *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So.2d 654 (La.1989).